IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARTHA WITHERWAX, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | CIVIL ACTION NO. _____ |
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF'S SWORN ORIGINAL COMPLAINT

Plaintiff Martha Witherwax ("Plaintiff" or "Ms. Witherwax"), files her Sworn Original Complaint, complaining of Defendant Exxon Mobil Corporation ("ExxonMobil" "Defendant", or "the Company").

1.     Ms. Witherwax brings this disability discrimination case under the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE ANN. § 21.001 *et seq*. and the Americans with Disabilities Act ("ADA"), 42 U.S.C. Section 12101 *et seq*. Ms. Witherwax also brings claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.

## THE PARTIES, JURISDICTION, AND VENUE

2.     The Plaintiff, Ms. Witherwax, is a natural person residing in Houston, Texas. Ms. Witherwax is a citizen of Texas. She has standing to file this lawsuit.

3.     The Defendant, ExxonMobil, is a domestic for profit business headquartered in Texas. ExxonMobil may be served with process through its Registered Agent, Corporation Service Company, 211 East Seventh Street, Suite 620, Austin, Texas 78701.

4.      During 2015 and 2016, ExxonMobil engaged in an industry affecting commerce and had 15 or more employees for each working day in each of 20 or more calendar weeks in both calendar years.  As such, ExxonMobil is an TCHRA and ADA defined "employer."  *See* TEX. LAB. CODE ANN. § 21.002(8) (defining employer for TCHRA purposes); 42 U.S.C. 12111(5) (defining employer for ADA purposes).

5.      The Court has personal jurisdiction over ExxonMobil based on both general and specific jurisdiction.  Personal jurisdiction is proper because ExxonMobil has continuous and systematic contacts with and in the State of Texas, and the events or omissions giving rise to the Plaintiff's claims occurred in the State of Texas.

6.      Subject matter jurisdiction is proper because Ms. Witherwax brings claims under two federal laws (the ADA and FMLA).   The court has supplemental jurisdiction over Ms. Witherwax's TCHRA claim.

7.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Southern District of Texas, and the unlawful employment practices alleged in this case occurred in the Southern District of Texas.

## FACTUAL BACKGROUND

**A.      In 1986 Ms. Witherwax Went To Work For ExxonMobil As A Contractor, And In 1995 She Was Hired As A Direct Employee**

8.      In 1986, Ms. Witherwax went to work for ExxonMobil as a contractor.  In 1995, she was hired by ExxonMobil as a direct employee.  Ms. Witherwax has an MBA in Business Administration.  In July 2008, she moved into the State Income Tax Compliance Department. She became a Tax Specialist in that department.  Her job was always a sedentary job that did not require the lifting of any significant weight, pushing, pulling, or carrying of any significant weight, or bending or twisting.  She mostly sat in front of a computer every day.   At all times

relevant to this case, ExxonMobil employed 50 or more employees within a 75-mile radius of Ms. Witherwax's worksite for each working day during each of 20 or more calendar workweeks. As such, it was at all times relevant, a "covered employer" under the FMLA. *See* 29 U.S.C. § 2611(4)(A)(I).

**B.      In April 2010, Because Of Disability Related Impairments, Ms. Witherwax Was Given A Medical Restriction Limiting Her To Working Eight Hours Per Day, And She Successfully Worked Under That Restriction – And Got All Her Work Done – For Years**

9.      In April 2010, as a result of transient ischemic related strokes over the years (in 2004, 2005, and 2009), a chronically bulging neck disc, cervical radiculopathy, lumbar radiculopathy, headaches, and a left cerebral infraction, Ms. Witherwax's neurologist restricted her to work a maximum of 8 hours per day, 5 days per week.  At the time, ExxonMobil did not claim that working more than 8 hours per day, 5 days per week, was an essential function of Ms. Witherwax's job, or that accommodating this schedule would present an undue hardship to the Company.  Rather, ExxonMobil accommodated the restriction, and Ms. Witherwax continued to work with the restriction in place (although she often worked in excess of the restriction by 1.25 hours per day or so, which was medically acceptable so long as she could take short breaks during the day, which she did).  Ms. Witherwax's supervisors were aware of this.  Ms. Witherwax got all of her work done, received consistently positive reviews, and received multiple raises.

10.      During this time, and at all other times after April 2010, Ms. Witherwax did not receive a lighter workload than her coworkers.  Rather, Ms. Witherwax did all her work in a slightly compressed time by taking shorter lunches and breaks, and working faster than many others in the department.  As a result, she got all her work done and often assisted other workers in the department to boot.

11.     In June 2015, Ms. Witherwax's supervisor in the State Income Tax Compliance Department, Susan Baldwin, retired.  She was replaced by Jennifer Williams.  At the same time, Ms. Witherwax also had to report to the other supervisor in the department, Lorraine Nesbitt. Ms. Williams and Ms. Nesbitt reported to the manager of the State Income Tax Compliance Department, Steve Lopez.   Mr. Lopez, in turn, reported to Jeff Sengele, the Manager of both the State Income Tax Compliance Department and the State Audit Department.   Mr. Sengele assumed that role in late 2014.  Mr. Sengele reported to David MacFarlane, Global Manager of ExxonMobil's Tax Reporting & Analysis Center ("TRAC").

12.     One of the first comments Mr. Sengele made after assuming his role in late 2014 was that he did not understand why Ms. Witherwax was on a permanent 8-hour per day schedule, and he instructed her to contact ExxonMobil's medical group to review that restriction (a request that was overruled by others with ExxonMobil).   Consistent with this comment, since Mr. Sengele took over that role, he, Mr. Lopez, Ms. Williams (after she assumed her role in approximately June 2015), and Ms. Nesbitt regularly demonstrated hostility towards Ms. Witherwax, and intentionally overloaded her with work so that: (a) Ms. Witherwax could not get all the work done in an 8-hour day (or even a 9.25 hour day); and (b) she was forced to work 10.5 hours per day or more, which, predictably, caused adverse health consequences, including elevated blood pressure, constant migraine headaches, stress, and insomnia.   The overloading of work was not something that normally happened in the workplace.  Rather, it was done with the intent of driving Ms. Witherwax from the workplace.

C.     **In February 2016, Ms. Witherwax Was Given A Medical Restriction Limiting Her To Working Six Hours Per Day, And In May 2016, ExxonMobil Placed Ms. Witherwax On An Involuntary FMLA Leave Of Absence From Which It Never Intended Her To Return**

13.     In February 2016, because of the medical problems caused by the hostility and overwork directed at her by Mr. Sengele, Mr. Lopez, Ms. Williams, and Ms. Nesbitt, Ms. Witherwax's cardiologist, Sheikh Ejaz Ahmed, M.D., restricted her to work a maximum of 6 hours per day.

14.     While Ms. Witherwax worked under the 6 hour per day restriction, Ms. Williams and Ms. Nesbitt again sought to overwork Ms. Witherwax by, for example, pulling work from coworkers in the department and giving it to Ms. Witherwax to do on short notice and with a short deadline for her to complete the work.  This was not something that normally occurred in the department.  It was, instead, something Ms. Williams and Ms. Nesbitt did with the intent of driving Ms. Witherwax from the workplace.  Ms. Witherwax complained about this to Amber Adams, an HR Advisor, but things did not get better.  Instead, Ms. Williams' and Ms. Nesbitt's hostility towards Ms. Witherwax intensified.

15.     On May 19, 2016, Mr. Lopez told Ms. Witherwax that ExxonMobil could no longer accommodate the 6 hours per day restriction, and she was involuntarily placed on a leave of absence.  An employee is eligible for FMLA leave if she has worked "at least 1,250 hours of service with [her] employer during the previous 12 month period." 29 U.S.C. § 2611(2)(A).  At the time she was involuntarily placed on leave by ExxonMobil, Ms. Witherwax had worked more than 1,250 hours in the preceding 12 months, and hence was an eligible employee under the FMLA.  At the time, Ms. Witherwax had leave available in her FMLA leave bank.

16.     The FMLA allows eligible employees 12 weeks of unpaid leave each year for "a serious health condition that makes the employee unable to perform the functions of the position

of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11). Based on the FMLA's definition, Ms. Witherwax had a "serious health condition," at the time she was placed on involuntary leave by ExxonMobil, and thus was entitled to take FMLA leave. Indeed, ExxonMobil itself confirmed in writing that Ms. Witherwax was entitled to use FMLA leave in May 2016, at approximately the same time it put her on the involuntary leave (ExxonMobil's FMLA Notice, Ex. 1). ExxonMobil reported to Ms. Witherwax that, at the time, she had approximately 19 work days (nearly one month of actual time) of remaining FMLA eligibility (*Id*). Despite this, Mr. Lopez told Ms. Witherwax on the day he sent her out on leave, May 19, 2016, that, "you are not coming back."

17.    At the same time, Mr. Lopez forced Ms. Witherwax to turn over her desk keys, company credit card, laptop with hard drive password, and her security Smartcard that gives access to the facilities and computer. In contrast, when Thomas Carella, a coworker in the State Income Tax Compliance Department, took an approximately five month leave of absence, he was not required to return any of those items. It appeared to Ms. Witherwax, and to her coworkers, that she was being terminated and, as Mr. Lopez stated, would not be returning to ExxonMobil. Later, a coworker in the department, Gary Johnson, told Ms. Witherwax that in a meeting shortly after May 19, 2016, Mr. Lopez told the group that she was not coming back and her work was going to be redistributed.

**D.**    **In September 2016, Ms. Witherwax Was Released To Work Again With An Eight Hour Restriction – The Same Restriction She Had Successfully Worked Under For More Than Five Years – But ExxonMobil Refused To Return Her To Work, Failed And Refused To Engage In The ADA-Mandated Interactive Process, And Instead Fired Her And Involuntarily Placed Her On Long Term Disability**

18.    On September 12, 2016, Ms. Witherwax's cardiologist and urogynecologist released Ms. Witherwax to work a maximum of 8 hours per day again.  She immediately sought to return to work that day but, on September 21, 2016, was told by Frank Olivo, HR Advisor, that her work group could not accommodate her 8 hours per day restriction.  She objected, and e-mailed Mr. Olivo the next day, September 22, 2016, and pointed out that her work group had accommodated that very restriction since April 2010, and nothing had changed.  On September 27, 2016, Mr. Olivo told Ms. Witherwax that he and Mr. Sengele were on a call with ExxonMobil lawyers about her situation, and Mr. Sengele took the position that the State Income Tax Compliance Department could not accommodate her 8-hour per day restriction.  Neither Mr. Olivo, nor anyone else, explained how it could be that the department was able to accommodate her 8-hour per day restriction from April 2010 until early 2016, but suddenly was unable to accommodate it at this time.

19.    On October 4, 2016, ExxonMobil changed its story.  That day, Ms. Witherwax was told by Mr. Olivo on the phone that it was not that her work group could not accommodate her 8-hour per day restriction, but rather there was no job for her because her position had been absorbed by her coworkers in the State Income Tax Compliance Department.  That is both suspicious and false:

a.    Indeed, just 13 days earlier, on September 21, 2016, LaToya Bass, Federal Income Tax Compliance Analyst, called Ms. Witherwax on the phone and told her that Mr. Lopez and Ms. Nesbitt had asked her to transfer into the State Income Tax Compliance Department performing the work Ms. Witherwax had been performing (Ms. Bass had previously worked in the State Income Tax Compliance Department).

b.  A coworker in the department, Gary Johnson, also told Ms. Witherwax that Ms. Bass had been visiting with Ms. Nesbitt a lot and heard Mr. Lopez tell Ms. Bass that he wanted her to come back to the State Income Tax Compliance Department.

c.  Moreover, recall that Ms. Witherwax's supervisors deluged Ms. Witherwax with work in order to drive her from the workplace. *See supra.* It thus makes no sense that, given the large amount of work to be done in the department, the Company no longer needed Ms. Witherwax and was able to absorb her workload with the employees that already existed in the department.

d.  As if to prove this point, Ms. Bass told Ms. Witherwax on September 21, 2016, that Mr. Lopez had told her that he wanted her to move into the State Income Tax Compliance Department because everyone working in the department was overloaded with work (Ms. Bass also told Ms. Witherwax that Ms. Nesbitt had told her that Ms. Witherwax was out on a "disciplinary" action for not doing her job, which is not true).

20.  Nevertheless, despite the need for workers in her department, and her being released to work 8 hours a day, Ms. Witherwax was not permitted to return to work. Although Ms. Witherwax sought any job at ExxonMobil – a huge company with thousands of jobs – the Company insisted no job was available that she could do. At the same time, Mr. Olivo – who was purportedly trying to accommodate her so she could remain employed – instead regularly dodged Ms. Witherwax's calls, and failed and refused to respond to her e-mails, texts, and voicemails.

21.  Ms. Witherwax sought some explanation for how it was that her job was "absorbed," and when that supposedly occurred. She had asked Mr. Olivo about this dubious claim – and challenged him on it – during their call on October 4, 2016. She also sent Mr. Olivo an e-mail on October 12, 2016, stating:

Frank,

Can you provide me any responses to the questions in my Oct. 5, 2016 email this week? Also, if I understood your comment to me on Oct. 4, 2016, State ITC is now saying it is not that they can't accommodate my 8 hour per day restriction, it is that my position was absorbed by my co-workers. Can you tell me when was my position absorbed by my co-workers? I was recently contacted by co-

-8-

workers checking to see how I was doing and learned State ITC is trying to find others from different sections of TRAC to transfer to State ITC? This would suggest to me that State ITC does have a position(s) available.

Regards,

Martha

(Witherwax E-mail of 10/12/16, Ex. 2).

22.     Her question is a good one:  How is it that her position was suddenly "absorbed" after she worked in the department for years, and yet at the same time ExxonMobil was seeking to transfer workers into her department?  Mr. Olivo never answered Ms. Witherwax's legitimate question.  No one else from ExxonMobil did either.   Instead, Mr. Olivo continued to dodge Ms. Witherwax's calls, and failed and refused to respond to her e-mails, texts, and voicemails.

23.     For example, between early October 2016 and October 20, 2016, Mr. Olivo simply ignored Ms. Witherwax's calls, e-mails, texts, and voicemails.   Then, at 8:43 p.m. on the evening of October 20, 2016, Mr. Olivo sent Ms. Witherwax an e-mail stating, "I will call you tomorrow at 1."  (E-mails between Olivo and Witherwax of 10/20/16 and 10/21/16, Ex. 3).   Ms. Witherwax responded by e-mail the next morning, stating, in relevant part:

Frank,

Receiving an e-mail from you at 8:43 p.m. last night surprised me.  I had given up on hearing back from you since I have not received a response to my e-mails, texts, and phone calls I placed to you in almost three weeks.

(E-mails between Olivo and Witherwax of 10/20/16 and 10/21/16, Ex. 3).

24.     Mr. Olivo responded on Friday, October 21, 2016, and informed Ms. Witherwax that they would have a teleconference on Monday, October 24, 2016 (*Id.* at 1).  Ms. Witherwax was hopeful that perhaps Mr. Olivo was going to talk with her about working interactively with her to explore reasonable ways in which she could remain employed at ExxonMobil, as she had

been for more than twenty years.  But, that was not the case.  Rather, unbeknownst to her, Mr. Olivo set up the call to tell Ms. Witherwax she was being fired.

25.     On Monday, October 24, 2016, Mr. Olivo and Mr. Sengele called Ms. Witherwax as scheduled and told her that the Company had no job for her, and she was being separated from ExxonMobil effective October 31, 2016.  They told her that her case had been unilaterally submitted to the Company's Disability Review Committee the prior Tuesday, and had been approved to separate her employment on Long Term Disability ("LTD") Status.  Ms. Witherwax asked how she could qualify for LTD despite the fact that she could work 8 hours per day, and they explained that, under the Company's LTD plan and Committee's approval, she could.

26.     On Thursday, October 27, 2016, Gary Johnson called Ms. Witherwax and told her that in a staff meeting on October 24, 2016, Jeff Sengele told the State ITC group that Ms. Witherwax had decided to retire as of October 31, 2016.  This, of course, is false.

27.     Effective November 1, 2016, Ms. Witherwax began receiving $5,937.50 per month in LTD benefits.  At the time of her termination, Ms. Witherwax's annual salary was $142,500.00, which translates into $11,875 per month.  Accordingly, each month Ms. Witherwax receives an LTD payment that is half of what she was earning at ExxonMobil, and will end entirely in June 2018.  Ms. Witherwax also participated in numerous employer-sponsored health, welfare, and pension plans that she can no longer participate in because of her termination.

## CLAIM FOR DISABILITY DISCRIMINATION UNDER THE ADA AND TCHRA

28.     Ms. Witherwax incorporates the preceding paragraphs of this petition as if set out verbatim.

**A.     Law**

29.     "The ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d

688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).  The TCHRA was "enacted to address the specific evil of discrimination and retaliation in the workplace." *City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex. 2008); see also TEX. LAB. CODE ANN. §§ 21.001–.566. The TCHRA's "general purposes" include executing "the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments (42 U.S.C. Section 12101 *et seq.*)" and securing "for persons in this state, including persons with disabilities, freedom from discrimination in certain employment transactions, in order to protect their personal dignity." TEX. LAB. CODE ANN. §§ 21.001(3) & (4).   Therefore, both the federal court decisions interpreting the ADA and the federal administrative regulations regarding the ADA guide Texas state court's interpretation of "disability" contained in the TCHRA. *See Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381–82 (Tex. 2004); *see also Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006) (applying federal court ADA precedent to a TCHRA disability discrimination claim); *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 993-1004 (W.D. Tex. 2012) (same).

30.   Under the TCHRA, "[a]n employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer ... fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment...." TEX. LAB. CODE ANN. § 21.051(1).  The same is true under the ADA.  *See* 42 U.S.C. § 12112.  Under the TCHRA, "[A]n unlawful employment practice is established when the complainant demonstrates that . . . disability was a motivating factor for an employment practice, even if other factors also motivated the practice...." *Id.* § 21.125(a).  The Texas Supreme Court has explained "that 'a motivating factor' is the correct standard for the plaintiff in

all TCHRA unlawful employment practice claims...." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001). This language states exactly "what a complainant must show in order to prevail in a lawsuit." *Id.* The same is true under the ADA. *See LHC Grp., Inc.*, 773 F.3d at 702 (applying "motivating factor" standard in an ADA case).

31.     "Texas courts follow the settled approach of the U.S. Supreme Court in recognizing two alternative methods of proof in discriminatory treatment cases." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). The first method "involves proving discriminatory intent via direct evidence of what the defendant did and said." *Id.* "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). "[M]otives are often more covert than overt, making direct evidence of forbidden animus hard to come by." *Garcia*, 372 S.W.3d at 634. "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). This limitation is not unique to discrimination cases – "[t]he law often obliges finders of fact to inquire into a person's state of mind." *Id.* Discrimination is not treated "differently than other ultimate questions of fact." *Id.*

32.     Accordingly, the second method allows a plaintiff to prove discriminatory intent using circumstantial evidence. *See El Paso Cmty. College v. Lawler*, 349 S.W.3d 81, 86 (Tex.App.—El Paso 2010, pet. denied); *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). This often involves "the burden-shifting mechanism of *McDonnell Douglas*." *Garcia*, 372 S.W.3d at 634 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)). "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence." *Trans*

*World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (quotations omitted). "Under this framework, the plaintiff is entitled to a presumption of discrimination if she meets the 'minimal' initial burden of establishing a *prima facie* case of discrimination." *Garcia*, 372 S.W.3d at 634. "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case is not onerous." *Id.* (quotations omitted).

33.   Under this framework, the plaintiff must make a *prima facie* showing of discrimination. *Id.* To establish a *prima facie* case of disability discrimination, a plaintiff must prove: (1) that she has a disability; (2) that she was qualified for the job; [and] (3) that she was subject to an adverse employment decision on account of his disability. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014).

34.   Once the *prima facie* showing is made, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 615.  The burden then shifts to the plaintiff to show the articulated reason is pretextual. *Id.*

35.   In this case, Ms. Witherwax can make out a *prima facie* case, and she has ample evidence that ExxonMobil's articulated reasons for her termination are either direct evidence of disability discrimination, or pretexts for disability discrimination. *See infra.*

**B.     Analysis**

**1.     Ms. Witherwax Has A "Disability" As Defined By The TCHRA/ADA**

36.   Under the TCHRA and ADA, a plaintiff may establish that they suffer from a "disability" by establishing an "actual disability," or a "perceived disability." TEX. LAB. CODE ANN. § 21.002(6); *see also Cannon v. Jacobs Servs. N.A., Inc.*, 813 F.3d 586, 590-92 (5th Cir. 2016) (explaining both definitions in an ADA case and finding that the plaintiff presented sufficient evidence for a reasonable jury to find that he suffered from either or both an "actual

-13-

disability" or a "perceived disability"). As set forth below, Ms. Witherwax satisfies either or both definitions of "disability" under the TCHRA and the ADA.

### a) Actual Disability

37.     Under Texas Labor Code Section 21.002(6), the term "disability" is defined, in relevant part, as, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." The same is true under the ADA. *See* 42 U.S.C. §12102(1). Under TCHRA Section 21.002(11-a) "major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. The term also includes the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." The same is true under the ADA. *See* 42 U.S.C. §12102(2).

38.     In 2009, statutory revisions to the ADA broadened the definition of disabled. ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (ADAAA) ("The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."). The ADAAA became effective January 1, 2009. Those amendments were also made to the Texas Labor Code, effective September 1, 2009, and thus are part of the TCHRA. *See* H.R. 978, 81st Leg., Reg. Sess. (Tex. 2009); *see also City of Houston v. Proler*, 437 S.W.3d 529, 533 n.17 (Tex. 2014) ("In 2009, the Texas Legislature added new provisions to the Labor Code that corresponded to the federal amendments.").

39.     Here, under the amended TCHRA and ADA, at all relevant times in this case, Ms. Witherwax had "a physical or mental impairment that substantially limits one or more major life

activities of [an] individual," in that the impairments caused by Ms. Witherwax's transient ischemic related strokes and a chronically bulging neck disc cased her angina, migraines, insomnia, depression, and substantially limited her in the major life activities of, *inter alia*, walking, running, lifting, and breathing, and also substantially limit her neurological, brain, cardiovascular and circulatory functions. *See* TEX. LAB. CODE ANN. § 21.002(11-a); 42 U.S.C. § 12102(2)(A); *Davis v. City of Grapevine*, 188 S.W.3d 748 (Tex. App.–Fort Worth 2006, pet. denied) (holding that running is a major life activity under the TCHRA).

40.    Because of her transient ischemic related strokes, and a chronically bulging neck disc, Ms. Witherwax took the following prescription medication during all relevant times, including throughout 2016:

     a.   Xanax (for stress/anxiety causing angina).

     b.   Bystolic (for high blood pressure which can cause strokes).

     c.   Amitriptyline (for issues with sleeping and migraines).

     d.   Zanaflex (for neck, shoulder and right hand pains).

     e.   Plavix (due to TIA mini strokes - to thin her blood and prevent strokes).

     f.   Lipitor (for high cholesterol).

41.    "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as – (I) medication  . . . ." 42 U.S.C. § 12102(4)(E)(i); *see also* 29 C.F.R. Pt. 1630, App. at Section 1630.2(j)(1)(vi) ("[S]omeone who began taking medication for hypertension before experiencing substantial limitations related to the impairment would still be an individual with a disability if, without the medication, he or she would now be substantially limited in functions of the cardiovascular or circulatory system."); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d

562, 574 (4th Cir. 2015) (pursuant to 42 U.S.C. § 12102(4)(E)(i) courts may not consider the ameliorative effects of mitigating measures in determining whether a plaintiff is disabled).  If Ms. Witherwax did not take the prescription medication identified above she would likely die (or be reduced to a comatose condition), which conclusively demonstrates that at all times relevant to this case Ms. Witherwax had "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."

### b)  Perceived Disability

42.    In the alternative to establishing an actual disability, the TCHRA and ADA provide that "disability" also means "being regarded as having such an impairment," which is proven if the individual establishes that he or she has been subjected to an action prohibited under the TCHRA or ADA because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.  TEX. LAB. CODE ANN. § 21.002(12-a); 42 U.S.C. § 12102(3)(A).  To establish "disability" under this section, Ms. Witherwax need only show that her "employer perceived [her] as having an impairment" and that it discriminated against him on that basis.  *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015).

43.    In this case, there is overwhelming proof that ExxonMobil perceived Ms. Witherwax "as having an impairment" and that it discriminated against her on that basis.  As to the "perceiving Ms. Witherwax as having an impairment" prong, ExxonMobil had ample documentation from Ms. Witherwax and her medical providers indicating that she had an impairment that precluded her from working more than an 8-hour per day; ExxonMobil itself spoke to her medical provider(s); and ExxonMobil unilaterally decided to force her onto its LTD plan for disabled workers.  This evidence amply satisfies the requirement to demonstrate that LGNA "perceived Witherwax as having an impairment" under the TCHRA and ADA.  *See*

*Burton*, 798 F.3d at 230-31 (doctors' notes received by employer and other medical related concerns of employer established that employer perceived the employee as having an impairment under the ADA).

44.     As to the "and that it discriminated against [her] on that basis" prong, that too is easily established because, among other reasons detailed herein, ExxonMobil fired Ms. Witherwax claiming that she was not fit for any job it had available due to her restriction and simultaneously forced her onto its LTD plan for disabled workers. *See Cannon, Inc.*, 813 F.3d at 591-92 (finding fact question existed on whether or not employer perceived plaintiff to have an impairment and discriminated against him on that basis under the ADA); *Burton*, 798 F.3d at 231 (same).

**2.  Second Element of Her *Prima Facie* Case:  Ms. Witherwax Was A Qualified Individual With A Disability**

45.     Under the TCHRA and ADA, the plaintiff can show the "qualification" element in one of two ways: (1) by proving that she can perform all essential job functions with or without modifications or accommodations; or (2) by showing that some reasonable accommodation by the employer would enable [her] to perform the job." *Austin State Hosp. v. Kitchen*, 903 S.W.2d 83, 91 (Tex.App.–Austin 1995, no writ); 42 U.S.C. § 12111(8).  Ms. Witherwax was a "qualified individual" because she could and did perform the essential functions of her job as a Tax Specialist in the State Income Tax Compliance Department with the 8-hour per day accommodation.  Indeed, Ms. Witherwax was a very good Tax Specialist for many years while working with that accommodation, as reflected by her consistently positive performance reviews.

46.     As this long historical positive performance using the 8-hour day accommodation indicates, the ability to work more than 8-hours per day (or 9.25 hour day, as she often worked

while under the restriction (with her supervisors' knowledge)) was not an essential function of the job Ms. Witherwax held at ExxonMobil, and thus her restriction in this regard did not render her "unqualified" under the ADA. *Cf. Feldman v. Olin Corp.,* 692 F.3d 748, 755-56 (7th Cir. 2012) (genuine issues of material fact as to whether an employee was "qualified" to work in certain positions given an overtime restriction resulting from sleep apnea and fibromyalgia precluded summary judgment against the employee on his ADA claim, despite employer's claim that working overtime was an "essential functions" of the job); *Reeder v. County of Wayne*, 177 F. Supp. 3d 1059, 1077-78 (E.D. Mich. 2016) (genuine issues of material fact as to whether mandatory overtime work was an essential function of a disabled police officer's job, which involved providing inmate security at county jail, precluded summary judgment for county based on a determination that officer was not qualified for the position with or without reasonable accommodations to his alleged mental disabilities that prevented him from working more than eight hours per day, in a disability discrimination action under ADA); *Ogden v. Vilsack*, No. C09–5523RJB, 2010 WL 2871123, at *8-9 (W.D. Wash. July 21, 2010) (genuine issues of material fact existed as to whether overtime and irregular hours were an essential function of the job of food inspector, and thus as to whether former employee, who had multiple sclerosis, was a qualified person with a disability).

### 3.   Ms. Witherwax Was Subject To An Adverse Employment Decision On Account Of Her Disability; And, ExxonMobil Violated Its Duty To Engage In The Interactive Process And To Make A Reasonable Accommodation

#### a)   Ms. Witherwax Was Subject To An Adverse Employment Decision On Account Of Her Disability

47.     There is no question that Ms. Witherwax suffered an adverse employment decision when she was terminated. *See LHC Grp., Inc.*, 773 F.3d at 700 (termination is an adverse action under the law).

48.     There is also no doubt that ExxonMobil terminated Ms. Witherwax because of her disability.  At first, on September 21 and 27, 2016, Mr. Olivo and Mr. Sengele told Ms. Witherwax that she could not be returned to her job because the department could not accommodate an 8 hour per day restriction.  *See supra*.  That rationale for barring Ms. Witherwax from her job is inherently tied to her disability.  As such, it constitutes "direct evidence" of ExxonMobil's discriminatory intent.  *See, e.g., Rizzo v. Children's World Learning Ctrs., Inc*., 84 F.3d 758, 762 (5th Cir. 1996) ("In the instant case there is direct evidence that Children's World made an employment decision because of a disability.  Children's World does not deny that Rizzo was removed from driving duties because of her hearing impairment.  Therefore, we need not engage in the *McDonnell Douglas* presumptions in order to infer discrimination: Children's World admits that it discriminated."); *see also Cannon, Inc.*, 813 F.3d at 594 (holding that if the plaintiff was disabled, and qualified for the job, and the employer nevertheless admittedly disqualified him for the job because of his disability related impairments, then it failed to offer a legitimate non-discriminatory reason and discriminated in violation of the ADA as a matter of law).

49.     Recognizing that Ms. Witherwax challenged that rationale for her being barred from returning to her job, and realizing that rationale would never hold up under legal scrutiny, ExxonMobil changed its reason for barring Ms. Witherwax from her job, and instead firing her.  On October 4, 2016, Ms. Witherwax was told by Mr. Olivo on the phone that it wasn't that her work group could not accommodate her 8-hour per day restriction, but rather there was no job for her because her position had been absorbed by her coworkers in the State Income Tax Compliance Department.  That is a false pretext for disability discrimination:

   a.  Indeed, just 13 days earlier, on September 21, 2016, LaToya Bass, Federal Income Tax Compliance Analyst, called Ms. Witherwax on the phone and told

-19-

her that Mr. Lopez and Ms. Nesbitt had asked her to transfer into the State Income Tax Compliance Department performing the work Ms. Witherwax had been performing (Ms. Bass had previously worked in the State Income Tax Compliance Department).

b. A coworker in the department, Gary Johnson, also told Ms. Witherwax on October 5, 2017, that Ms. Bass had been visiting with Ms. Nesbitt a lot and heard Mr. Lopez tell Ms. Bass that he wanted her to come back to the State Income Tax Compliance Department.

c. Moreover, recall that Ms. Witherwax's supervisors deluged Ms. Witherwax with work in order to drive her from the workplace. *See supra.* It thus makes no sense that, given the large amount of work to be done in the department, the Company no longer needed Ms. Witherwax and was able to absorb her workload with the employees that already existed in the department.

d. As if to prove this point, Ms. Bass told Ms. Witherwax on September 21, 2016, that Mr. Lopez had told her that he wanted her to move into the State Income Tax Compliance Department because everyone working in the department was overloaded with work.

50.   It is also noteworthy, and relevant proof of pretext, that ExxonMobil changed its reason for ridding itself of Ms. Witherwax from first claiming on September 21 and 27, 2016, that it could not accommodate her 8-hour per day work restriction, and but then claiming on October 4, 2016, that the real reason was that her job had been absorbed by the other workers in the State Income Tax Compliance Department.

51.   Then, on October 24, 2016, ExxonMobil gave a third reason for getting ride of Ms. Witherwax.  Specifically, according to Gary Johnson, on October 27, 2016, Gary Johnson called Ms. Witherwax and told her that in a staff meeting on October 24, 2016, Jeff Sengele told the State ITC group that Ms. Witherwax had decided to retire as of October 31, 2016.  This, of course, is false.  Ms. Witherwax did not decide to retire – she was fired and forced onto LTD status.

52.   That ExxonMobil had given at least three different conflicting reasons for Ms. Witherwax's separation from the Company is additional proof of pretext and discrimination *vel*

*non*. *See e.g.*, *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (reversing summary judgment for the employer in an ADA and FMLA case, and stating that, "[a]n employer's inconsistent explanations for an employment decision "cast doubt" on the truthfulness of those explanations."); *Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."); *see also Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408 (5th Cir. 2007) (shifting explanations can be evidence of pretext); *Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002) (same).

53.     Moreover, context is key here, and it too militates in favor of a finding of pretext and discrimination *vel non*.  As the Fifth Circuit has stated: "[j]ust as ""[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Donaldson v. CDB Inc.*, 335 Fed. Appx. 494, 503 (5th Cir. 2009).  In this case, a reasonable jury could conclude based on the evidence that:

   a. Ever since Mr. Sengele took over his role in late 2014, he, Mr. Lopez, Ms. Williams (after she assumed her role in approximately June 2015), and Ms. Nesbitt regularly demonstrated hostility towards Ms. Witherwax, and intentionally overloaded her with work in an effort to drive her from the workplace.

   b. After Ms. Witherwax was restricted to work 6-hour days in May 2016, ExxonMobil decided then to use that as its opportunity to put her on a terminal leave of absence from which she would never return – to get rid of her because of her disability.

   c. Consistent with this theory, recall that on May 19, 2016, Mr. Lopez told Ms. Witherwax, "you are not coming back."  At the same time, Mr. Lopez forced Ms. Witherwax to turn over her desk keys, company credit card, laptop with hard drive password, and her security Smartcard that gives access to the facilities and computer.  In contrast, when Thomas Carella, a coworker in the State Income Tax Compliance Department, took an approximately five month leave of absence, he was not required to return any of those items.  It appeared to Ms. Witherwax, and

-21-

to her coworkers, that she was being terminated and, as Mr. Lopez stated, would not be returning to ExxonMobil.  Later, a coworker in the department, Gary Johnson, told Ms. Witherwax that in a meeting shortly after May 19, 2016, Mr. Lopez told the group that she was not coming back and her work was going to be redistributed.

d.  All this evidence, combined with ExxonMobil's refusal to return Ms. Witherwax to work, or to any job, when she was released to work 8 hours per day in September 2016 strongly suggests that ExxonMobil bore animus against Ms. Witherwax for some time because of her disability; decided to fire her because of her disability in May 2016; and just made up other reasons later on (first the supposed inability to accommodate her 8-hour restriction, and then the claim that her job had been "absorbed") to effectuate its plan when she did try to return to work in September and October 2016 with the same restrictions she had successfully worked with for more than five years.

e.  ExxonMobil's claim that Ms. Witherwax's job was suddenly and inexplicably "absorbed" after she had worked in the job for years is beyond dubious.  When Ms. Witherwax called Mr. Olivo on it in her October 4, 2016 e-mail to him (*see supra*), she tellingly got no response at all; she just got ignored and then fired.

f.  No one else working in the State Income Tax Compliance Department was terminated based on their job supposedly being "absorbed" by coworkers.  Only Ms. Witherwax was fired and told that her job had been "absorbed" by her coworkers in the department.

g.  Indeed, even if one credited ExxonMobil's belated and pretextual claim that Ms. Witherwax's job was "absorbed" by her coworkers in the State Income Tax Compliance Department, the question remains why only the job of the disabled worker in the department (Ms. Witherwax) was absorbed.  ExxonMobil never answered that question, but the answer is plain: she was targeted based on her disability.

54.  Based on the foregoing, it is evident that Ms. Witherwax can make out a *prima facie* case, and she has ample evidence that ExxonMobil's articulated reasons for her termination are either direct evidence of disability discrimination, or pretexts for disability discrimination. *See Rizzo*, 84 F.3d at 762 (direct evidence); *Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a circumstantial evidence discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . .

is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).

             **b)**      **ExxonMobil Violated Its Duty To Engage In The Interactive Process And To Make A Reasonable Accommodation**

      55.     One final point regarding the reasonable accommodation and the interactive process requirements remains to be addressed.  The ADA and TCHRA require employers to try to work interactively with disabled employees, so as to provide them a reasonable accommodation. *See Chevron Phillips Chem. Co.*, 570 F.3d at 622 ("Under the ADA, once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that *together* they can determine what reasonable accommodation might be available.") (emphasis in original).

      56.     The Fifth Circuit has recognized that "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (citation omitted).  Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Id.* (citation omitted). The process thus requires "communication and good-faith exploration."  *Id.* (citation omitted).

      57.     The Fifth Circuit has held: "when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Jenkins v. Cleco Power LLC*, 487 F.3d 309, 316 (5th Cir. 2007). Such is the case here: Separate and apart from ExxonMobil's illegal refusal to return Ms.

Witherrwax to her job (*see supra*), the Company also violated its duty to engage in an interactive process and make a reasonable accommodation.

58.     The law under the TCHRA is the same: "Once the employee identifies a disability and resulting limitations, and suggests a reasonable accommodation, the employer and the employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *Hagood v. County of El Paso*, 408 S.W.3d 515, 525 (Tex.App.–El Paso 2013, no pet.). "The interactive process requires communication and good-faith exploration." *Id.* (internal citations omitted). "When an employer does not engage in a good faith interactive process, the employer violates the [TCHRA]." *Id.*

59.     On September 21, 2016 and September 27, 2016, ExxonMobil told Ms. Witherwax that it would not return her to her former job. *See supra*.  Ms. Witherwax questioned that, and also expressed a desire to take any job that was open.  A month later, on October 24, 2016, Mr. Olivo and Mr. Sengele called and told her that the Company had no job for her, and she was being separated from ExxonMobil effective October 31, 2016.  They told her that her case had been submitted to the Company's Disability Review Committee the prior Tuesday and had been approved to separate her employment on LTD Status.  Under the ADA, as the EEOC has stated: "[T]he employer is obligated to inform an employee about vacant positions for which s/he may be eligible as a reassignment."  EEOC, No. 915.002, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* (Oct. 17, 2002), available at 2002 WL 31994335, at Q&A 28.  But, before unilaterally submitting her case to the Company's Disability Review Committee in order to get rid of her based on her disability, ExxonMobil never gave Ms. Witherwax a meaningful chance to apply for any vacant positions she may have been eligible for.

-24-

60.    The evidence thus indicates that ExxonMobil had already made up its mind by May 19, 2016, that Mr. Witherwax was not going to be allowed to return to work – as Mr. Lopez flat-out stated that day – and thus the Company had already decided to get rid of Ms. Witherwax, rather than engage in any interactive process in an effort to retain her as an employee.

61.    The EEOC's position is that an employer's obligation to offer reassignment to a vacant position as a reasonable accommodation is not limited to those vacancies within the employee's office, branch, agency, department, facility, personnel system, or geographical area. Rather, according to the EEOC, the employer must consider vacant positions in its entire operations – which in ExxonMobil's case would be the entire world – unless to do so would impose an undue hardship.  *See* EEOC, No. 915.002, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* (Oct. 17, 2002), available at 2002 WL 31994335, at Q&A 27.  ExxonMobil did not do that, and did not do anything remotely close to that.  Instead, it just ran Ms. Witherwax off and forced her onto its LTD plan. *See supra.*

62.    ExxonMobil's failures to engage in the interactive process, and to make reasonable accommodations, are highlighted by the fact that, between September 27, 2016 and October 24, 2016, the HR Advisor assigned to Ms. Witherwax, Mr. Olivo, regularly dodged her calls, and failed and refused to respond to her e-mails, texts, and voicemails.  Ms. Witherwax documented this failure in an e-mail to Mr. Olivo himself on Friday, October 21, 2016 (E-mails between Olivo and Witherwax of 10/20/16 and 10/21/16, Ex. 3).   Mr. Olivo did not deny the charge.  Instead, he set up a meeting to fire her the very next business day (*Id.* at 1).

63.    Mr. Olivo's repeated dodging violates the interactive process requirement, which mandates that employers engage in, "a meaningful dialogue with the employee to find the best

means of accommodating that disability." *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (citation omitted).  The process thus requires "communication and good-faith exploration."  *Id.* (citation omitted).  Mr. Olivo and ExxonMobil failed on all these fronts.

**C.      Damages Under The TCHRA And ADA**

64.      Ms. Witherwax incorporates the preceding paragraphs of this petition as if set out verbatim.

65.      The elements of damages under the TCHRA and ADA case are back-pay, front-pay, compensatory damages, punitive damages, and attorneys' fees.  Each element is explained below.

66.      Back-pay.  Prevailing claimants under the TCHRA and ADA may recover lost back-pay and benefits between the date of termination and the jury's verdict.  TEX. LAB. CODE ANN. § 21.258; 42 U.S.C. § 12117(a). At the time of her termination, Ms. Witherwax was earning $142,500.00.  Ms. Witherwax has been unemployed since her termination, but receiving half her monthly salary each month under the ExxonMobil LTD plan.  This translates into a monthly loss of $5,937.50.    The LTD plan cuts off her benefits in June 2018.  As such, if Ms. Witherwax is not reemployed by then, the monthly wages loss from that point forward will be $11,875.

67.      An additional amount is lost given that Ms. Witherwax participated in the Company's 401k that included a 7% Company match that translated into $831.24 per month.  As a result of her termination, she can no longer participate in the 401k, and no longer receives the match of $831.24 per month.

68.      Similarly, because Ms. Witherwax was separated from the Company effective November 1, 2016 instead of March 1, 2022 (when she planned to retire), she will only have 21.41 years of service from June 1, 1995 to November 1, 2016 used in her pension payment

calculation, whereas if she had been allowed to work to March 1, 2022, she would have 26.75 years of service.  This difference translates into a loss of approximately $142,146.50 to her pension.

69.     Front-pay. "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  The TCHRA and ADA allow a plaintiff to recover front pay when a plaintiff shows that reinstatement is not feasible.  TEX. PATTERN JURY INSTRUCTIONS § 110.30, Comment, Front Pay (2003 ed.) (citing similar federal law); *cf. Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992); 42 U.S.C. § 12117(a).  Generally, reinstatement is the preferred equitable remedy for a discriminatory discharge. *Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 2002).  However, if reinstatement is not feasible, front pay will be awarded if it is consistent with the remedial purposes of the law. *Brunnemann*, 975 F.2d at 180.  "[R]einstatement is not preferred over front pay when there is no vacancy in the desired position." *Mitchell v. Sisters of Charity of Incarnate Word*, 924 F. Supp. 793 (S.D. Tex. 1996) (quoting *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir. 1985)).  In other words, if reinstatement would require displacing or bumping an innocent employee from their job, then it is considered to be infeasible, and front-pay may be awarded instead of reinstatement. *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995).  The proper measure of front-pay is the amount of compensation lost between the date of the jury's verdict and a reasonable retirement age. *See Dell, Inc. v. Wise*, 424 S.W.3d 100, 114 (Tex. App.–Eastland 2013, no pet.) (stating in a TCHRA age discrimination case that "[f]ront pay is lost compensation from trial forward until a reasonable retirement age, which also is a fact question for the jury."); *see also Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 n.8 (5th Cir. 1996) ("[f]ront pay is usually invoked when

reinstatement is impracticable and is calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages.") (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)). *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

70.     Ms. Witherwax is 57-years old.  She planned to retire March 1, 2022.  Thus, in this case, if front-pay, rather than reinstatement, were ordered then, in addition to the back-pay award, there would be an additional award of lost wages and other lost compensation (for example, her 401k and pension losses) through March 1, 2022 – likely another three-years or so after the date of trial in this case.  Such a model falls comfortably within the case law in this area from the Fifth Circuit. *See, e.g., Jackson v. Host Int'l, Inc.*, Nos. 09–51137, 10–50026, 2011 WL 2119644, at *8-9 (5th Cir. Feb. 1, 2011) (Fifth Circuit decision affirming five-year front-pay award for age discrimination under the TCHRA); *Mota v. University of Texas Houston Health Science Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (affirming front-pay award of approximately ten years).  It is also consistent with Texas state court decisions. *See Wise*, 424 S.W.3d at 114 (stating in a TCHRA age discrimination case that "[f]ront pay is lost compensation from trial forward until a reasonable retirement age, which also is a fact question for the jury."); *cf. River Oaks L-M. Inc. v. Vinton-Duarte,* 469 S.W.3d 213, 235 (Tex.App.-Houston [14th Dist.] 2015, no pet) (affirming award of $164,000 in front-pay in a single-plaintiff TCHRA case and total damages of $625,197.87).

71.     <u>Compensatory damages/mental anguish</u>.  The TCHRA and ADA allow for recovery of compensatory damages for ". . . emotional pain, suffering, inconvenience, mental

-28-

anguish, loss of enjoyment of life, and other nonpecuniary losses[.]" TEX. LAB. CODE ANN. §

21.2585(d); 42 § 1981a(b)(3). Ms. Witherwax has suffered significant emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses due to

her illegal termination, and thus she is entitled to compensatory/mental anguish damages. *See,

e.g., Jackson*, 2011 WL 2119644, at *8-9 (affirming $300,000.00 mental anguish award for

discrimination under the TCHRA); *Giles v. General Elec. Co.*, 245 F.3d 474, 489 (5th Cir. 2001)

(awarding $150,000.00 compensatory damages award in an ADA case).

72.     <u>Punitive Damages</u>.  Claimants under the TCHRA and ADA are also entitled to

punitive damages where a violation is shown to have been made with reckless disregard or

malice – as it was here. *See, e.g., Quality Dialysis, Inc. v. Adams*, NO. 13-05-086-CV, 2006 WL

1553353, at *11 (Tex. App.–Corpus Christi June 8, 2006, no pet.) (affirming jury's award of

punitive damages against employer in a discrimination case under the TCHRA); *Ford v.

Diversified Technology, Inc.*, 370 Fed. Appx. 502 (5th Cir. 2010) (affirming verdict for plaintiff

in a Title VII retaliation case, and holding that the issue of punitive damages was for the jury to

decide); *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 733-34 (5th Cir. 2007)

(upholding $300,000.00 punitive damages award under 42 U.S.C. § 1981a(b)(1) in an ADA

case).

73.     <u>Attorneys' fees</u>. Attorneys' fees are recoverable to a prevailing plaintiff under the

TCHRA and ADA.  *See* TEX. LAB. CODE ANN. § 21.259(a); 42 U.S.C. § 12117; *Lewallen v. City

of Beaumont*, 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of

$428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins

v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in

a single-plaintiff discrimination case tried in Houston $336,010.50 in attorneys' fees).

**D.      Exhaustion Under The TCHRA And The ADA**

74.      Ms. Witherwax incorporates the preceding paragraphs of this petition as if set out verbatim.

75.      Ms. Witherwax has satisfied all conditions precedent necessary to file this suit, and has exhausted all required pre-suit administrative remedies.

76.      In order to comply with the exhaustion requirement under the TCHRA, a claimant must: (1) file a complaint with the Texas Workforce Commission – Civil Rights Division ("TWC-CRD") within 180 days of the alleged discriminatory act; (2) allow the TWC-CRD to dismiss the complaint or resolve the complaint within 180 days before filing suit; and (3) file suit no later than two years after the complaint is filed. *Rice v. Russell-Stanley, L.P.*, 131 S.W.3d 510, 513 (Tex. App.–Waco 2004, pet. denied); Tex. Lab. Code §§ 21.201-.202, 21.208 (Vernon 2006). Thus, a plaintiff need not actually obtain a right-to-sue letter in order to exhaust his or her administrative remedies; he or she need only be entitled to one. "Texas courts hold that it is the entitlement to a right-to-sue letter rather than the receipt of the letter that exhausts the complainant's administrative remedies." *Wooten v. Federal Exp. Corp.*, No. 3:04–CV–1196–D, 2007 WL 63609, at *8 n. 14 (N.D. Tex. Jan. 9, 2007) (citing *Rice v*, 131 S.W.3d at 513), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009). In other words, "the right-to-sue letter is not part of the exhaustion requirement, only notice of exhaustion [is required]." *Rice*, 131 S.W.3d at 513.

77.      Based on the foregoing legal standards, Ms. Witherwax has satisfied all the requirements to exhaust her administrative remedies and bring this lawsuit under the TCHRA. This is so because: (1) Ms. Witherwax filed a complaint with the TWC-CRD and the EEOC on October 31, 2016, which is within 180 days of the discriminatory actions she complains of in this suit; (2) since filing the complaint with the TWC-CRD and EEOC, she has allowed the TWC-

CRD 180 days to dismiss or resolve the complaint, and it has done neither; and (3) less than two years have passed since Ms. Witherwax filed his complaint with the TWC-CRD and the EEOC.

78.     Concerning exhaustion under the ADA, Ms. Witherwax filed a timely TWC-CRD/EEOC charge and, on April 21, 2017, the EEOC issued a Right-to-Sue Letter to her.  She received the letter on April 25, 2017.  Pursuant to the EEOC's Right-to-Sue Letter, Ms. Witherwax had ninety days from its receipt to file a timely ADA claim.  She has filed this suit just six days after she received the Right-to-Sue Letter.  Hence, her ADA claim is also administratively exhausted and timely.

### CLAIMS FOR INTERFERENCE AND RETALIATION UNDER THE FMLA

79.     Ms. Witherwax incorporates the preceding paragraphs of this petition as if set out verbatim.

80.     The FMLA was enacted to permit employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition. 29 U.S.C. § 2601(b)(2).  Congress enacted the FMLA in response to concern over "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." *Miller v. AT & T Corp.*, 250 F.3d 820, 833 (4th Cir. 2001) (internal quotations omitted).  The FMLA redresses the "serious problems with the discretionary nature of family leave" by guaranteeing leave to qualified employees in certain circumstances. *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 732 (2003) (internal quotations omitted).

81.     "The FMLA has two distinct sets of provisions, which together seek to meet the needs of families and employees and to accommodate the legitimate interests of employers." *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001) (citing *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999); *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d

379, 383 (5th Cir. 1998)).  The first set of provisions are prescriptive: They create a series of substantive rights, namely, the right to take up to twelve weeks of unpaid leave under certain circumstances. *Id.*  The provisions in the second set are proscriptive: they bar employers from penalizing employees and other individuals for exercising their rights. *Id.*; *see also* 29 U.S.C. § 2615(a)(1)-(2); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999); *Bocalbos*, 162 F.3d at 383 ("[T]he Act protects employees from interference with their leave as well as against discrimination or retaliation for exercising their rights.") (citations omitted); *Faris v. Williams WPC-I, Inc.*, 332 F.3d 316, 320-22 (5th Cir. 2003) (holding that there is a distinction between substantive FMLA rights and causes of action for retaliation designed to protect those rights). Ms. Witherwax brings claims of both FMLA interference, and FMLA retaliation.

82.    <u>FMLA Interference Claim</u>.  The FMLA guarantees eligible employees a total of twelve weeks of leave in a one-year period when the leave relates to the employee's serious health condition. 29 U.S.C. § 2612(a)(1)(D). To ensure employees the right to take leave, the FMLA prohibits an employer from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" provided by the Act. 29 U.S.C. § 2615(a).  ExxonMobil was a covered employer under the FMLA, and Ms. Witherwax was an eligible employee under the FMLA.  *See supra*.  In fact, in May 2016, Ms. Witherwax was approved in writing by ExxonMobil for at least approximately 19 work days (approximately one actual month) of FMLA leave (ExxonMobil's FMLA Notice, Ex. 1).  Despite this, Mr. Lopez told Ms. Witherwax on the day he sent her out on leave, May 19, 2016, that, "you are not coming back."  This alone violates the law's proscription against "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right" provided by the FMLA. 29 U.S.C. § 2615(a).

83.     <u>FMLA Retaliation Claim</u>.  To make out a *prima facie* case for retaliation under §

2615(a)(2), a plaintiff must show that: (1) she was protected under the FMLA; (2) she suffered

an adverse employment decision; and either (3a) that she was treated less favorably than an

employee who had not requested leave under the FMLA; or (3b) the adverse decision was made

because she took FMLA leave. *Hunt*, 277 F.3d at 768 (citation omitted).  If this initial burden is

met, the employer-defendant must then articulate a legitimate reason for the employment action.

*Hunt*, 277 F.3d at 768.  If that is done, the employee must then show that the articulated reason

was actually a pretext for retaliation. *Id*.  The plaintiff need not prove that the exercise of FMLA

rights was the sole cause of the unfavorable treatment; "[t]he plaintiff is, however, required to

show that the protected activity and the adverse employment action are not completely

unrelated." *Mauder v. Metropolitan Transit Authority of Harris Cty., Texas*, 446 F.3d 574, 583

(5th Cir. 2006).

84.     Here, Ms. Witherwax satisfies all the required elements to make out a *prima facie*

case.  She was FMLA eligible.  She suffered an adverse employment action (termination).  And,

she was treated less favorably than numerous employees who did not request FMLA leave –

specifically, all the coworkers in the State Income Tax Compliance Department.  None of them

requested or took FMLA leave, and none of them had their jobs allegedly "absorbed" by others,

thus resulting in their terminations.  It is beyond suspicious that only Ms. Witherwax – the

disabled worker who took FMLA leave – had her job allegedly "absorbed," thus resulting in her

termination.

85.     Timing also supports Ms. Witherwax's claim.  She was fired approximately four

months after she took and exhausted her FMLA leave.  This is additional evidence of a casual

connection between her FMLA leave and his termination. *See Heggemeier v. Caldwell Cty.*, 826

F.3d 861, 870 (5th Cir. 2016) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation."); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (observing that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes" (internal citations omitted); *Cantu v. Vitol, Inc.*, Civil Action No. H-09-0576, 2011 WL 486289, at *10 (S.D. Tex. Feb. 7, 2011) (Rosenthal, J.) (noting that "the Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link.").

86.     Further, as set forth above, ExxonMobil's conflicting reasons for firing Ms. Witherwax do not hold up up analysis, and reek of pretext.  *See, e.g., Burton v. Freescale Seminconductor, Inc.*, 798 F.3d 222, 241 (5th Cir. 2015) (close timing can, when combined with other evidence, raise an inference of pretext).  The same reasons that compel a finding of pretext as to Ms. Witherwax's TCHRA and ADA claims, also compel a finding of pretext as her FMLA retaliation claim.  *See Caldwell*, 850 F.3d at 246 (reversing summary judgment granted for employer in an ADA and FMLA case because the same evidence of pretext rendered summary judgment improper on both claims).

87.     The icing on the cake is Mr. Lopez's comment to Ms. Witherwax on May 19, 2016, that "you are not coming back" in front of her coworkers in her work group.  He said that even thought she was leaving for leave of absence that was FMLA protected.  At the same time, Mr. Lopez forced Ms. Witherwax to turn over her desk keys, company credit card, laptop with hard drive password, and her security Smartcard that gives access to the facilities and computer.  In contrast, when Thomas Carella, a coworker in the State Income Tax Compliance Department, took an approximately five month leave of absence, he was not required to return any of those

items.  It appeared to Ms. Witherwax, and to her coworkers, that she was being terminated and, as Mr. Lopez stated, would not be returning to ExxonMobil.  Later, a coworker in the department, Gary Johnson, told Ms. Witherwax that Mr. Lopez told the group that she was not coming back and her work was going to be redistributed.  This is either direct evidence of FMLA retaliation, or, at the very least, extraordinarily compelling circumstantial evidence.

88.     An employer that violates the FMLA may be liable for lost wages and benefits, liquidated damages, reinstatement or front-pay, attorney fees, and court costs. 29 U.S.C. § 2617(a).  Under the FMLA, an employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation (such as back pay and front pay), and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered.  *See* 29 C.F.R. § 825.400(c); *Downey v. Strain*, 510 F.3d 534, 545 (5th Cir. 2007) (awarding two years of front pay to prevailing FMLA plaintiff).

89.     Under the FMLA, an award of liquidated damages (double the back-pay award) is the norm.  *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 929 (5th Cir. 1999) (awarding liquidated damages to prevailing FMLA plaintiff and noting that they are normally to be awarded to prevailing FMLA plaintiffs).   "[A] district court may not exercise its discretionary authority to reduce or to eliminate a liquidated damages award unless the employer first sustains its burden of showing that its failure to obey the statute was in good faith." *Nero*, 167 F.3d at 928. Specifically, to avoid an award of liquidated damages, the employer must demonstrate good faith and reasonable grounds with respect to "the act or omission which violated" the FMLA. 29 U.S.C. § 2617(a)(1)(A)(iii).  ExxonMobil cannot demonstrate "good faith" under this demanding standard, and thus is liable for liquidated damages.

-35-

90.     Any out-of-pocket expenses for health insurance Ms. Witherwax had through ExxonMobil, or for replacement insurance, would be recoverable under the FMLA (as well as the TCHRA and ADA).   *See Lubke v. City of Arlington*, 455 F.3d 489, 499 (5th Cir. 2006); *Pearce v. Carrier Corp.*, 966 F.2d 958, 959 (5th Cir. 1992).

## JURY DEMAND

91.     Ms. Witherwax demands a jury trial.

## PRAYER

92.     Ms. Witherwax asks that the court issue citation for Defendant ExxonMobil to appear and answer, and that she be awarded a judgment against Defendant ExxonMobil for the following:

a.    Actual damages including by not limited to pecuniary losses, non-pecuniary losses, back-pay, front-pay (or reinstatement) under the TCHRA, ADA, and FMLA;

b.    Compensatory damages under the TCHRA, ADA, and FMLA;

c.    Punitive damages under the TCHRA and ADA;

d.    Liquidated damages under the FMLA;

e.    Prejudgment and post-judgment interest;

f.    Attorneys' fees;

g.    Court costs; and

h.    Injunctive and equitable relief;

i.    A tax off-set;

j.    All other relief to which Plaintiff is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:    s/ Mark J. Oberti
        Mark J. Oberti
        State Bar No. 00789951
        S.D. Texas No. 17918
        712 Main Street, Suite 900
        Houston, TX 77002
        (713) 401-3555 – Telephone
        (713) 401-3547 – Facsimile
        mark@osattorneys.com – Email

        ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

| DESCRIPTION OF EXHIBITS TO ORIGINAL COMPLAINT | EXHIBIT |
|---|---|
| ExxonMobil FMLA Notice | 1 |
| Witherwax E-mail of 10/12/16 | 2 |
| E-mails between Olivo and Witherwax of 10/20/16 and 10/21/16 | 3 |

## AFFIDAVIT OF MARTHA WITHERWAX

STATE OF T E X A S       §
                         §
COUNTY OF HARRIS     §

        On this day, Martha Witherwax appeared before me, the undersigned authority, who upon her oath, deposes and states:

1.    I am over the age of 21, competent to make this affidavit, and have personal knowledge that everything stated herein is true and correct.  I have read Plaintiff's Sworn Original Complaint in this case.  Unless otherwise indicated as being on "information and belief," the statements under the heading "Factual Background" in Plaintiff's Sworn Original Complaint are all true and correct on my personal knowledge.

2.    The exhibits attached to Plaintiff's Sworn Original Complaint are true and correct copies of the originals.

3.    Further, Affiant sayeth naught.

                                  MARTHA WITHERWAX

        SUBSCRIBED AND SWORN TO before me on this the 27th day of April 2017, certify which witness my hand and seal of office.

                                  Notary Public in and for
                                  The State of TEXAS
                                  Printed name: Angela S. Clark

LISA M GREER
NOTARY PUBLIC-STATE OF TEXAS
COMM. EXP. 11-09-2019
NOTARY ID 12631803-7

# EXHIBIT 1

**ExxonMobil Corporation**
22777 Springwoods Village Parkway
Spring, Texas 77389



**MPI Classification: PRIVATE**

May 26, 2016

Ms MARTHA WITHERWAX
7803 EVERGREEN TERRACE
HOUSTON, TX 77040-5539

Re:  FMLA Eligibility, Rights and Responsibilities, and Designation Notices

Dear Ms MARTHA WITHERWAX:

The Family and Medical Leave Act (FMLA) requires employers to make available twelve (12) weeks of unpaid leave to employees for family and medical reasons.  One of those reasons is for the employee's own serious health condition.  Attachment 1 notifies you of your eligibility (Part A), rights and responsibilities (Part B), and designation of leave status (Part C), in relation to your current health-related absence.  This attachment contains important information concerning your absence from employment under the FMLA.  Please read it and all accompanying attachments carefully.

On May 20, 2016, you were placed on short-term disability (STD) benefits in light of the permanent work restriction received by the ExxonMobil Medical and Occupational Health Department (MOH) on May 12, 2016.  Time away from work in a STD status will run concurrently with the remainder of your 12-week FMLA leave entitlement as is indicated in the FMLA Designation Notice detailed in Part C of Attachment 1.

Complete information concerning your disability benefit entitlement is available on-line at www.exxonmobilfamily.com.  In general, the duration of your disability benefit is calculated based on the length of your qualifying employment.  Your length of benefit service at the start of this current disability is 20 complete years.  Based on your years of service and prior utilization of STD benefits, as of May 20, 2016, if continuously absent, your last day of full pay disability benefit is September 27, 2016; your last day of half pay disability benefit is March 28, 2017.

The Company has a strict policy prohibiting retaliation or discrimination against an employee for taking or requesting FMLA leave.  If you feel you have been discriminated or retaliated against, please report the incident to your manager's manager, or to me, your Human Resources Advisor.

Please sign one copy of this form and return it to my attention in the Human Resources department within five (5) business days either electronically or via US mail to 22777 Springwoods Village Parkway, Spring, TX 77389 (Science 2, 3B.514).



EXHIBIT
**1**

Feel free to contact me at (832) 624-4643 if you have any questions concerning this matter. Thank you.

Regards,

*Amber S. Adams*

**Exxon Mobil Corporation**
HR Advisor, Global Staff Functions
Client Contact: Downstream Business Services, Risk
Management & Insurance, & TRAC

Enclosure (Health / Dependent Care Leave Guidelines)

Acknowledged:

_____        _____
Employee's Signature                    Date  6/1/2016

_____
Employee's Printed Name

**ATTACHMENT 1**

## PART A - NOTICE OF ELIGIBILITY

To be eligible for leave under the FMLA you must have been employed for at least 12 months, have worked at least 1,250 hours in the 12 months preceding the date you are requesting that leave begin, and work at a location where there are at least 50 employees within 75 miles.  Your employment status renders you eligible for FMLA leave.

If you have any questions concerning this eligibility determination, please contact me, Amber S. Adams (your Human Resources Advisor) by email at amber.s.adams@exxonmobil.com or by phone by calling 832.624.4643.

## Part B - RIGHTS AND RESPONSIBILITIES

Since it has been determined that you are an eligible employee, this notice provides important information regarding the effect of your absence from employment, including information about the steps and procedures that you must follow since your absence has been determined to be covered under the FMLA, i.e. "FMLA Leave."  Your absence will be covered if you are not only *eligible*, but also are *qualified* for leave under the FMLA.

### Medical Certification

The Company currently has sufficient medical certification to determine that your current absence qualifies for coverage under the FMLA.  So that the Company can verify that your absence continues to qualify for coverage under the FMLA, you must continue to provide to the Medical Department the attending healthcare provider's certification ("Certification") in support of the medical condition for which you are on leave.

To assist you in complying with this requirement, included is a link to the appropriate Certification form document (IDR Form) -- http://www.exxonmobil.com/Family-English/HR/Files/IDR_form.doc. The Medical Department (MOH) must be provided information to re-certify your medical condition at the expiration of the initial Certification period, and every 30 calendar days thereafter, should your leave extend beyond the original Certification period.  Re-Certification must also be submitted at the time of any change in circumstances of the qualifying medical condition.  You are responsible for insuring that the appropriate health care provider timely submits all necessary re-Certifications.

If you fail to provide a Certification, any requested clarification thereof (which you must provide within seven calendar days of the date of request), or any re-Certification as required, your leave will not be covered by the FMLA, and additionally, will be considered unexcused to the extent that it is not covered by another form of leave obtained through advance authorization.

At any time should the Company have reason to doubt the sufficiency of any healthcare provider Certification that you provide to MOH in relation to your medical condition, you may be requested, at the Company's sole discretion, to provide a second medical opinion.  In the event of a conflict between the original medical Certification and the second healthcare provider's opinion, a third opinion may be sought, again, at the Company's sole discretion, from a provider selected jointly by you and the Company.  The opinion of any such third healthcare provider will be determinative and binding on both

you and the Company.  The cost of any second and third healthcare provider opinions will be borne solely by the Company.

Finally, be aware that each Certification, or re-Certification should include a statement as to your intent, and the projected date of your ability to return to work upon expiration of the leave period, so as to allow the Company to properly plan for your return.

## Maintenance of Health Insurance Benefits While on Leave

During any period of FMLA leave, your health insurance benefits coverage will be maintained on the same terms as if you were currently working.  As such, you will be responsible for paying your normal employee contribution toward the required premium.  If you have been certified for disability payments under the disability plan for some or all of the period of requested FMLA leave, or have remaining paid vacation, your required employee contribution toward health insurance premiums will continue to be subtracted through payroll deduction until such benefits have exhausted.  In the absence of disability or other paid leave benefits, you must promptly make payment of your portion of the insurance premium to the Company by the first day of each month.  You are responsible for informing yourself concerning the sufficiency of any remaining disability or vacation benefit, and providing prompt payment to the Company in the absence thereof.  You may contact US Benefits Administration at 800-262-2363 to obtain information regarding how to submit your share of your health insurance premium.

In the event that you fail to make a timely health insurance premium contribution payment to the Company, and your payment becomes more than thirty (30) days past due, the Company may discontinue paying its portion of the health insurance premium on your behalf, and your coverage will cease, provided we notify you in writing fifteen (15) days in advance of the termination date. Conversely, the Company may choose to continue your coverage, but you will remain liable for repayment of any employee contribution paid on your behalf, upon your return to active employment.  If the amount of retroactive contributions you owe exceeds your ability to make a payment you may arrange a repayment plan.

In the event your insurance coverage lapses, your coverage will be restored upon your return to work following FMLA leave, provided you elect to continue such coverage and make the required premium payments at that time.

In the event you elect to continue your health insurance coverage during your FMLA leave, but, upon conclusion of such leave, fail to return to employment for reason other than: (1) a continuation, recurrence, or onset of a serious health condition that would entitle you to FMLA leave, or (2) other circumstances beyond your control (as defined consistent with the FMLA), you may be required to reimburse the Company for *its* share of the health insurance premiums paid on your behalf during your FMLA leave.  Notwithstanding, you may be able to continue your health benefits beyond the resignation of your employment pursuant to the Consolidated Ominibus Budget Reconciliation Act of 1985 (COBRA).  You will be provided with a notice explaining your COBRA rights, if any, in that event.

## Your Responsibilities and Conduct While on Leave

During your period of FMLA leave you must promptly respond to all the Company's phone calls and written correspondence related to this FMLA leave.  Additionally, you must keep the Company informed at all times of your intention to return to work upon the completion of your FMLA leave.  It is your responsibility to notify MOH of any changes to your anticipated return date, as well as your continued intention to return to work sufficient to insure that the Company has at least two days advance notice of

your date of return.  If you are unable to contact the Company, please arrange to have someone do so on your behalf.

Please be aware that working at another job while on FMLA leave is strictly prohibited, and is grounds for immediate termination.

**Right to be Restored to Position and Return to Work**
The Company has determined that you are not considered a "key employee" as defined in the FMLA regulations, therefore, you may receive FMLA leave on the bases set forth herein.  Furthermore, you have the right, for the duration of your FMLA leave including the date that your FMLA leave terminates, to be restored to the same, or an equivalent position if you return to work.  However, if for any reason your position with the Company is eliminated, or you otherwise are not entitled to retain the position for performance related or other valid reasons, you will not be entitled to restoration.

Following the expiration of your FMLA leave, you are required to provide a medical certification from your healthcare provider that you are able to resume work, and are capable of performing the essential functions of your position.  You may not return to work until you have provided this certification to MOH.  Please be aware that absences caused by your failure to provide a return to work certification from your healthcare provider will be considered unexcused, and that you may be subject to discipline for these unexcused absences.

**Part C -- DESIGNATION NOTICE**

Your current leave will be designated as leave under the FMLA and is being counted against your FMLA entitlement.  As an eligible employee, you are entitled to up to 12 weeks (or the remaining FMLA leave balance thereof) of unpaid leave as determined based on the 12-month period measured backward from the date your leave began.  As of January 7, 2016, you had 60 work days available for your 12-week FMLA entitlement.  Between January 7, 2016 and April 12, 2016, you used 27 work days of your FMLA entitlement leaving 33 days (264 hours) remaining.  Starting with 264 hours and subtracting the 113 hours not worked to accommodate your February 15, 2016 documented MOH work restriction, please note that 151 hours (19 work days) remain of your FMLA leave balance.  Using May 20, 2016 as the date to continue use of your remaining 151 hour leave balance, June 15, 2016 marks work day 60.  You have the right to request the balance of FMLA leave available to you once in a 30 day period.

As indicated, your leave entitlement will be unpaid, unless your condition qualifies as a disability under the Company's disability plan, is covered by workers' compensation benefits, or you have remaining vacation or other paid leave benefits, which, as to vacation, you may elect to use concurrent with your FMLA leave, but consecutively in regard to other leaves.  If disability pay is unavailable or insufficient, and you have insufficient paid leave or choose not to use your paid leave to cover the period of your FMLA-qualifying absence, you remain eligible to take FMLA leave on an unpaid basis.

Finally, during the period of any FMLA leave, any remaining leave for which you are eligible under the Company's Health/Dependent Care Leave guidelines will run concurrently with your utilization of FMLA leave benefits.  A copy of the ExxonMobil Health/Dependent Care Leave guidelines is attached for your reference; it can also be accessed via the company intranet here:
http://intrattd.na.xom.com/emhr/us/?path_info=/emhr/us/benefits/details/other/healthleave.

# EXHIBIT 2

Print

https://mg.mail.yahoo.com/neo/launch?.partner=sbc&.rand=6qkfp7o...

*Email Chain #36*
*pg 1 of 3*

**Subject:** Re: Your question

**From:** martha witherwax (mwitherwax@sbcglobal.net)

**To:** jacquelyn.m.abbott@exxonmobil.com;

**Cc:** frank.j.olivo@exxonmobil.com;

**Date:** Wednesday, October 12, 2016 8:16 AM

Jackie,

Thanks for the additional information. Please let me know what you find out after you confirm this with the LTD administrator.  Also please confirm that my understanding (below recap) is correct and can you answer my questions?

1. I would qualify for LTD from May 20, 2016 thru May 19, 2018 for LTD if ExxonMobil doesn't have a job for me meeting my 8 hour per day restriction.
    1. Question:  Will I be contacted before the package is sent to me.
    2. Question:  Will I use up the Short Term Disability Plan entitlement and then start LTD?
    3. Question:  When will I be notified that ExxonMobil has no job meeting my current 8 hour restriction?  I think this would be sometime Frank would let me know before the LTD process is started is that correct?
2. After or around May 19, 2018, the LTD administrator performs the test to see if there is a job that I can perform that would replace at least 60% of my monthly benefit pay (unless my 8 hour day restriction has been lifted).
    1. Question: Is the 60% test to find a job within ExxonMobil?
    2. Question: What if I remain on the 8 hour day restriction, do I continue to qualify to receive LTD?
    3. Question:  What if my 8 hour per day is lifted allowing me to work overtime, will ExxonMobil let me return to work?

Frank,
Can you provide me any responses to the questions in my Oct. 5, 2016 email this week?  Also, if I understood your comment to me on Oct. 4, 2016, State ITC is now saying it is not that they can't accommodate my 8 hour per day restriction, it is that my position was absorbed by my co-workers.  Can you tell me when was my position absorbed by my co-workers?  I was recently contacted by co-workers  checking to see how I was doing and learned State ITC is trying to find others from different sections of TRAC to transfer to State ITC?  This would suggest to me that State ITC does have a position(s) available.

Regards,

Martha



EXHIBIT
2

Print

https://mg.mail.yahoo.com/neo/launch?.partner=sbc&.rand=6qkfp7o...

*Email Chain #36*
*Pg 2 of 3*

On Tuesday, October 11, 2016 4:57 PM, "Abbott, Jacquelyn M" <jacquelyn.m.abbott@exxonmobil.com> wrote:

Hello Martha,

That is a very good question, but yes, I think that you would.  For the first two years from your last day worked (sometime in May), you qualify if ExxonMobil doesn't have a job for you.  After that first two years, then the LTD administrator determines if there is a job that you can perform that would replace at least 60% of your monthly benefit pay unless your restrictions have been lifted at that time, e.g. you are no longer limited to 8 hours a day.  I will ask the LTD administrator about this last piece to make sure and get back to you.  Okay?

Regards,
Jacquie Abbott

832-624-5488 office

This message and attachments may contain information that is confidential,  attorney-client privileged and exempt from disclosure under applicable law. If you are not the intended recipient, please notify me immediately.  Any unauthorized disclosure, copying,  distribution or taking action in reliance on the contents of this message and any attachments is prohibited.

**From:** martha witherwax [mailto:mwitherwax@sbcglobal.net]
**Sent:** Tuesday, October 11, 2016 4:16 PM
**To:** Abbott, Jacquelyn M
**Cc:** Olivo, Frank J
**Subject:** Re: Your question

Jackie,

Thank you so much for the response.  Would I qualify for LTD if my doctors have released me to work an 8 hour day?  If so, how long would I qualify for LTD if my doctors indicate I can work 8 hours ongoing?

Thanks,

Martha

On Tuesday, October 11, 2016 2:57 PM, "Abbott, Jacquelyn M" <jacquelyn.m.abbott@exxonmobil.com> wrote:

Hello Martha,

If there is no job identified, then it is my understanding that you would be separated with the ability to apply for LTD.  This is consistent with the conversation we had in May.

Jacquelyn M. Abbott

11/4/2016 8:36 AM

*Email Chain #36*
*pg 3 of 3*

Supervising Tax Counsel
Compensation and Benefits

Exxon Mobil Corporation
1735 Hughes Landing Blvd., W.02.S294
The Woodlands, TX  77380
832-624-5488 office
832-648-5426 fax

This message and attachments may contain information that is confidential,  attorney-client privileged and exempt from disclosure under applicable law. If you are not the intended recipient, please notify me immediately.  Any unauthorized disclosure, copying,  distribution or taking action in reliance on the contents of this message and any attachments is prohibited.

# EXHIBIT 3

Print

Email Chain #35
pg 1 of 7

**Subject:** RE: PRIV: Updated Form 315 - Martha Witherwax

**From:** Olivo, Frank J (frank.j.olivo@exxonmobil.com)

**To:** mwitherwax@sbcglobal.net;

**Date:** Friday, October 21, 2016 10:08 AM

Let's discuss Monday at 12:30.

--

Frank J. Olivo

Human Resources Advisor

Global Staff Functions

**ExxonMobil Corporation**

22777 Springwoods Village Parkway

Science 2, 3B.527

Spring, TX 77389

832 625 5733 Skype

This message may contain confidential and/or private information. If you have received this note in error, you must not use, copy, disclose, or take any action based on this message or any information herein. Please contact the sender (Frank J. Olivo) immediately by reply and promptly delete the note.

**From:** martha witherwax [mailto:mwitherwax@sbcglobal.net]
**Sent:** Friday, October 21, 2016 8:41 AM
**To:** Olivo, Frank J <frank.j.olivo@exxonmobil.com>
**Subject:** Re: PRIV: Updated Form 315 - Martha Witherwax

Frank,



EXHIBIT
**3**

1 of 3

11/4/2016 8:30 AM

Print

*Email Chain # 38*
*pg 2 of 7*

Receiving an email at 8:43 p.m. last night surprised me.  I had given up on hearing back from you since I have not received a response to my emails, texts, and phone calls I placed to you in almost three weeks.  I am not available this afternoon. I have some appointments that require my attention.


Regards,


Martha


On Thursday, October 20, 2016 8:43 PM, "Olivo, Frank J" <frank.j.olivo@exxonmobil.com> wrote:


Hi Martha,
I will call you tomorrow at 1.

--
Frank J. Olivo
Human Resources Advisor
Global Staff Functions

**ExxonMobil Corporation**
22777 Springwoods Village Parkway
Science 2, 3B.527
Spring, TX 77389
832 625 5733 Skype

This message may contain confidential and/or private information.  If you have received this note in error, you must not use, copy, disclose, or take any action based on this message or any information herein.  Please contact the sender (Frank J. Olivo) immediately by reply and promptly delete the note.

**From:** martha witherwax [mailto:mwitherwax@sbcglobal.net]
**Sent:** Monday, October 17, 2016 4:12 PM
**To:** Johnson, Rhonda K <rhonda.k.johnson@exxonmobil.com>; Thomas, Jacklyn M <jacklyn.m.thomas@exxonmobil.com>; Olivo, Frank J <frank.j.olivo@exxonmobil.com>
**Cc:** Witherwax, Martha J <martha.j.witherwax@exxonmobil.com>
**Subject:** Re: PRIV: Updated Form 315 - Martha Witherwax

Rhonda,

Thanks for the copy of the updated 315 form based on my Oct. 13th appointment.   Let me know if anything else is needed from me at this time.

Thanks,

Martha

*Email Chain #38*
*pg 3 of 7*

On Monday, October 17, 2016 3:57 PM, "Medicine.occupational.health@exxonmobil.com" <Medicine.occupational.health@exxonmobil.com> wrote:

Please do not "reply" to this email that was generated from the MOH Summit System. If needed, you may contact me via Outlook email address or numbers below.

Regards,
Rhonda Johnson, RN, BSN, MBA, COHN-S
Certificate in Travel Health TM
ExxonMobil Medical & Occupational Health
WC-2A.105
22777 Springwoods Village Parkway
Spring, TX 77389
832-624-6995 Office (Lync)
713-824-5769 Cell
414-208-2016 Fax
Rhonda.K.Johnson@exxonmobil.com